UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARJORIE G.,

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:22-cv-00547-TPK

OPINION AND ORDER

## OPINION AND ORDER

    This case is again before the Court to consider a final decision of the Commissioner of Social Security which denied Plaintiff's application for social security disability benefits. In an order dated April 29, 2021, and with the parties' consent, the Court granted Plaintiff's motion for judgment on the pleadings in Case No. 1:20-cv-0062 and remanded the case to the Commissioner for further proceedings. Following remand, an Administrative Law Judge issued an unfavorable decision on March 15, 2022, which constituted the Commissioner's final decision. After filing the complaint in this case, Plaintiff moved for judgment on the pleadings (Doc. 21) and the Commissioner filed a similar motion (Doc. 24). For the following reasons, the Court will **GRANT** Plaintiff's motion for judgment on the pleadings, **DENY** the Commissioner's motion, and **REMAND** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### I.  BACKGROUND

    Plaintiff protectively filed her application for benefits on February 4, 2013, alleging disability since August 21, 2011, which date was later amended to July 14, 2012. After initial administrative denials of her claim, Plaintiff appeared at a hearing before an Administrative Law on April 14, 2015. The ALJ issued an unfavorable decision on July 15, 2015. Afterwards, the Appeals Council remanded the case for the purposes of obtaining additional evidence, and a second administrative hearing was held on February 26, 2018. A second unfavorable decision was issued on April 18, 2018. After The Appeals Council denied review, Plaintiff filed an action in this Court, and the Court ordered a remand, after which a third administrative hearing was held on January 29, 2020. Plaintiff and a vocational expert, Victor Alberigi, testified at that hearing.

    The ALJ issued an unfavorable decision on March 15, 2022. He found, first, that Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2013, and that she had not engaged in substantial gainful activity since her alleged onset date.

Next, he determined that she suffered from severe impairments including chronic obstructive pulmonary disease, emphysema, anxiety disorder, depressive disorder, panic disorder, and obesity. He further found that none of these impairments, considered singly or in combination, met the criteria for disability under the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ concluded that Plaintiff could perform a limited range of medium work. She could not work around extremes of temperature, wetness, or humidity, however, nor could she tolerate concentrated exposure to fumes, dusts, gases, poor ventilation, and other respiratory irritants. The ALJ further found that Plaintiff was able to work in a low stress environment doing simple work and without supervisory duties, independent decision-making, or strict production quotas. She could also tolerate only minimal changes to the work routine and processes, could maintain concentration and attention and regular attendance for simple, unskilled work, and could occasionally interact with others.

The ALJ found that with these limitations, Plaintiff could not do her past relevant work as an injection molding machine operator or home attendant. However, based on the vocational testimony, he determined that she could perform unskilled medium jobs such as housekeeper, laundry aide, and clerical assistant. He also found that these jobs existed in significant numbers in the national economy. As a result, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between her alleged onset date and the expiration of her insured status.

In her motion for judgment on the pleadings, Plaintiff raises these issues, stated here *verbatim*:

I. The ALJ totally failed to consider ample treatment evidence supporting Plaintiff's allegations of extreme psychiatric limitations during the relevant time period, resulting in a gross mischaracterization of this record.

II. The ALJ improperly evaluated the opinion evidence in this case, mischaracterizing Plaintiff's longitudinal treatment and failing to adequately consider the ample evidence from the relevant time period supporting the opinions.

    A. The ALJ did not consider the full contents of Dr. Tzetzo's opinion.

    B. The ALJ improperly evaluated Dr. Sheikh's opinions pursuant to the treating physician rule because he ignored the contents of Dr. Sheikh's treatment notes and mischaracterized the opinions.

    C. The ALJ improperly weighed Dr. DeMarco's consulting opinion because, once again, he mischaracterized the opinion and

> failed to consider evidence from the relevant time period that supports the opinion.
>
> D. The ALJ's evaluation of Dr. Shamsi's and LMHC Shaffer's opinions repeated the same errors he made with Dr. DeMarco's opinion, and ignored the reality of the record which indicates that Plaintiff began treating with Dr. Shamsi during the relevant time period.

Plaintiff's memorandum, Doc. 21-1, at 1.

## II. THE KEY EVIDENCE

### A. Hearing Testimony

At the first administrative hearing, held in 2015, Plaintiff, who was 40 years old at the time, first testified that she had worked up until July of 2012 as a residential worker in a rehabilitation facility. Before that, she had been an assistant manager at a convenience store and had also done factory work and waitressing. She completed the 11th grade but had not obtained a GED. She said that her daughter was the only person she socialized with.

As far as daily activities were concerned, Plaintiff said she could dress and feed herself and could do household chores with some help. She did not shop for groceries or do yard work, but she could play computer games and watch television. Plaintiff said she had been seeing a psychiatrist and a counselor since 2013 and that she was also being treated for migraine headaches which occurred on a daily basis. Additionally, she testified that she had trouble sleeping and rarely left her house due to both physical pain and anxiety. Anxiety was one of the reasons she stopped working.

At the 2018 hearing, Plaintiff said that she stopped working due both to anxiety and depression and because she had had a heart attack. Her condition had worsened since that time and was also worse that it was in September of 2013. She said she was now having panic attacks on a daily basis. She drove infrequently and only to medical appointments. Plaintiff did socialize not only with her children but also her mother and her siblings, but only in her home. She also described side effects from her medications, which included muscle twitches, bowel and bladder issues, and mental confusion.

The final hearing was held in 2022. Plaintiff's testimony was largely cumulative of the testimony she gave at the two prior hearings except for some additional details about her past work. The vocational expert who testified, Victor Alberigi, first identified Plaintiff's past jobs as injection molding machine operator and home attendant. He was then asked questions about a person with Plaintiff's vocational profile who could do medium work but had some environmental and mental limitations, and said that such a person could not perform either of

Plaintiff's past two jobs.  The expert then gave examples of jobs that such a person could do, which included housekeeper, laundry aide, and clerical assistant.  He said those jobs involved at least minimal contact with a supervisor, so if the person could have no contact at all with others, he or she could not do those jobs.  The same was true of an individual who would be off task 20% of the time or absent from work more than twice per month.

### B.  Medical Evidence

Plaintiff's primary treating source during the time frame in question, which ends on September 30, 2013, was Dr. Sheikh.  Those treatment notes are well summarized in Plaintiff's memorandum, *see* Doc. 21-1 at 3-5, and the Court will not repeat that summary other than to say that Plaintiff had been diagnosed with, among other ailments, depression and panic attacks, that she reported significant depression and anxiety as well as episodes of losing consciousness, and she was prescribed medications to treat depression, anxiety, and paranoid ideation and advised to seek psychiatric treatment.  That treatment began in July of 2013.  The psychiatric treatment notes are also summarized in Plaintiff's memorandum, and showed that on examination both by a social worker and a psychiatrist, Dr. Shamsi, Plaintiff demonstrated a depressed and anxious mood, impaired memory, psychomotor agitation, and preoccupied thought content.  She also reported no improvement from the medications prescribed by Dr. Sheikh.  When later seen by Dr. Sheikh, she said that the medications prescribed by Dr. Shamsi were not effective either.  Plaintiff's self-reports during that time frame included the inability to be around people and an inability to concentrate.

### C.  Opinion Evidence

To some extent, an opinion about Plaintiff's ability to work is contained in the handwritten portions of Dr. Sheikh's treatment notes.  Although somewhat difficult to read, they show that shortly after she stopped working, Dr. Sheikh continued her off work until September of 2012 (Tr. 513); noted in November of that year that Plaintiff was having severe panic attacks and could not work (Tr. 488-89); continued to state that she was off work in January of 2013 until a workup was done (Tr. 505); and said in March, 2013 that she was off work until further order (Tr. 486).

Plaintiff saw Dr. Ippolito, a psychologist, for a psychiatric evaluation on May 28, 2013.  Plaintiff said that she stopped working due to her heart condition and to anxiety.  She reported difficulty sleeping, dysphoric moods, crying spells, diminished self-esteem, and social withdrawal.  She also said she was worried, restless, and afraid to leave her home.  When she did, she experienced panic attacks.  On examination, Plaintiff appeared somewhat restless, her affect was anxious, and her mood was dysthymic.  Her concentration and attention were impaired, as were her memory skills.  Dr. Ippolito thought that Plaintiff could follow and understand simple directions and instructions and could perform simple tasks independently.  She could also relate to others and deal adequately with stress, leading to the conclusion that her problems did not interfere with her ability to function on a daily basis.  (Tr. 436-440).

On October 7, 2016, more than three years after the expiration of her insured status, Plaintiff attended another consultative examination, this one conducted by Dr. DeMarco. Plaintiff told Dr. DeMarco that her symptoms had been present while she was working but got worse once she lost her job, eventually making her housebound. She was very agitated when leaving home to the point of vomiting and hyperventilating. Plaintiff and her husband both said that she was highly reactive to minor psychosocial stressors. On examination, she showed some psychomotor agitation but her memory was generally intact. Dr. DeMarco diagnosed an anxiety disorder and dysthymia with intermittent episodes of major depression. She believed that Plaintiff was moderately limited in her ability to understand and remember simple instructions but markedly impaired in other work-related areas. She also had an extreme limitation on her ability to interact with others and to respond to changes in the work setting. Dr. DeMarco noted that these limitations were reported to have been present for 5-6 years and that Plaintiff could not manage benefits in her own best interest. (Tr. 556-64).

On January 10, 2017, Dr. Shamsi and Plaintiff's therapist, Kristen Shaffer, filled out a mental residual functional capacity form. They noted that Plaintiff's current "episode of care" began in March of 2015 (although, as noted above, Plaintiff had been seeing Dr. Shamsi earlier than that). The narrative portion of the report states that "Patient demonstrates severe symptoms on a consistent basis that greatly impact her ability to function." Under "signs and symptoms," they reported, among other things, decreased energy, generalized persistent anxiety, difficulty thinking or concentrating, persistent mood disturbance, memory impairment, and recurrent severe panic attacks. They believed Plaintiff was either unable to meet competitive standards or had no useful ability to function in ten different work-related areas, that she was unable to deal with the stress of even unskilled work, and that she would miss work more than four days per month. (Tr. 618-22). Ms. Shaffer filled out another such form on February 8, 2018, confirming that Plaintiff had been in treatment on and off since 2013, and also stating that she had marked or extreme limitations in 18 work-related areas of functioning. (Tr. 723-27).

On June 17, 2021, Plaintiff's most recent counselor, Kyle Wiktor, indicated that he was seeing her six times per month and that he believed her mental health symptoms prevented her from working. He checked the box for "Precludes all performance in a regular work setting" for every mental work-related ability listed on the form, said she would be off task for more than 30% of the time, and that she would miss more than four days of work per month. (Tr. 972-76).

There is also one pertinent state agency reviewer opinion. On June 25, 2013, Dr. Tzetzo concluded that Plaintiff was moderately limited in her ability to maintain concentration and attention for extended periods, to perform within a schedule and maintain regular attendance, to sustain an ordinary work routine, to complete a normal workday and work week without interruption from psychologically based symptoms, to interact appropriately with the general public, to maintain socially appropriate behavior, and to respond to changes in the work setting. She also indicated, when evaluating whether Plaintiff's impairment met the Listings, that she could handle brief and superficial contact with co-workers and the public and could deal with ordinary levels of supervision, thus retaining the ability to perform simple jobs. (Tr. 117-19, 121-23).

## III. STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012).

## IV. DISCUSSION

### A. Interpretation of the Evidence

Because all of the claims of error made here (setting aside, for the moment, the claim that the ALJ did not properly determine if Plaintiff's conditions satisfied the Listing of Impairments) relate to the ALJ's characterization and interpretation of the medical evidence, the Court will consider those claims as a whole. To summarize this aspect of Plaintiff's argument, she contends, first, that the ALJ erred by not taking Dr. Sheikh's treatment notes into account when considering whether, during the relevant time period, Plaintiff suffered from a disabling mental impairment. Next, Plaintiff argues that the ALJ then compounded that error by misstating the evidence concerning Plaintiff's mental status examinations and by giving the most weight to two opinions - those from Dr. Ippolito and Dr. Tzetzo - which were issued before there was any evidence in the record that Plaintiff had begun mental health treatment. She also asserts that Dr. Tzetzo's opinion contained numerous restrictions that were not incorporated into the residual

functional capacity finding without explanation and that the ALJ did not properly analyze Dr. Sheikh's opinion as to disability. Lastly, she submits that the ALJ erred in his analysis of the opinions of Drs. DeMarco and Shamsi and of Ms. Shaffer, particularly mischaracterizing all of them as relating to time frames after the expiration of Plaintiff's insured status. The Commissioner responds that the ALJ appropriately analyzed and weighed the evidence and that Plaintiff is simply asking this Court to reweigh the evidence, something which is not permitted under the prevailing legal standard.

The ALJ's decision is here, as in most cases, the starting point for the Court's analysis. The ALJ began by noting that mental status exams during the relevant time period showed several abnormalities, including "depressed and anxious mood ... mildly impaired memory and thought content characterized by preoccupation with external stressors." (Tr. 737). Plaintiff also had impaired attention and concentration during the consultative examination. *Id*. However, according to the ALJ, other examinations "consistently show that the claimant had normal findings with her mood, appearance, speech, memory, insight, judgment, thought content, and thought processes" as well as "intact attention and concentration at times." *Id*. The ALJ concluded that, overall, the evidence showed "significantly normal objective findings and no longitudinal activity restrictions."

Turning to the opinion evidence, the ALJ gave significant weight to Dr. Tzetzo's findings, concluding that they were consistent with Dr. Ippolito's observations and the "overall evidence, including ... generally stable mental status examinations." (Tr. 738). Dr. Ippolito's opinion was also given significant weight for essentially the same reasons. (Tr. 738-39). Little weight was given to Dr. Sheikh's expressions of Plaintiff's need to be off work because, the ALJ reasoned, these were "temporary assessments measuring the claimant's functional mobility throughout treatment." (Tr. 739). Dr. DeMarco's opinion was heavily discounted due to its having been rendered three years after the expiration of Plaintiff's insured status, although the ALJ also noted that to the extent the opinion purported to address her condition at an earlier time, it "relies heavily on the subjective report of symptoms and limitations provided by the claimant ...." *Id*. He also did not view it as "accurately reflect[ing] the evidence of record during the period at issue...." *Id*. For basically the same reasons, the ALJ gave little weight to the opinion of Dr. Shamsi, even though he was a treating source, and to Ms. Shaffer's, pointing out that their opinion noted that the most recent "episode of care" which they had provided to Plaintiff did not begin until March of 2015 even though they had treated her earlier as well. *Id*. Finally, the ALJ observed that Kyle Wiktor's opinion was issued seven years after the last insured date and that "[t]he provider provided no basis to support this opinion as it relates to the claimant's functional capacity prior to the date last insured." For all of these reasons, the ALJ crafted a mental residual functional capacity finding which was generally in line with the findings of the consultative examiner and the state agency consultant, Drs. Ippolito and Tzetzo.

When Plaintiff's application for benefits was filed, the "treating physician" regulation found at 20 C.F.R. §404.1527 was still in effect (it has since been repealed). As this regulation has been interpreted,

> "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " [*Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir.2008)] at 128 (quoting 20 C.F.R. § 404.1527(c)(2)). There are, of course, circumstances when it is appropriate for an ALJ not to give controlling weight to a treating physician's opinion. *See, e.g., Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004) (per curiam) (holding that "the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts"). Nevertheless, even when a treating physician's opinion is not given controlling weight, SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive. See 20 C.F.R. § 404.1527(c)(2)(I), (2)(ii), (3)–(6). "[T]o override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequen[c]y, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir.2013) (per curiam). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Burgess*, 537 F.3d at 129 (alteration in original) (*quoting Halloran*, 362 F.3d at 33). The failure to provide " 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id*. at 129–30 [citation omitted]. The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion. *Id*. at 131.

*Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015).

In addition to this legal precept, this Court has said that:

"It is well-settled that while an ALJ need not mention every item of testimony presented or reconcile explicitly every conflicting shred of medical testimony, ... the ALJ may not ignore or mischaracterize evidence of a person's alleged disability." *Seignious v. Colvin*, 2016 WL 96219, *4 (W.D.N.Y. 2016) (alterations, citations, and quotations omitted). Indeed, where "the ALJ's supporting rationale for his physical RFC assessment [is] based on several mischaracterizations of the record," the resulting RFC assessment is "legally flawed and unsupported by substantial evidence." *Id*. at *5; see also King v. Colvin,* 2016 WL 1398987, *4 (W.D.N.Y. 2016) ("[w]here an ALJ mischaracterizes the evidence or relies on only the portions of the record that support a conclusion of 'not disabled,' a remand is necessary"); *Ellis v. Colvin*, 29 F. Supp. 3d 288, 302 (W.D.N.Y. 2014) ("[i]t was plainly improper for the ALJ to

    bolster his own RFC assessment with a blatant misstatement of the record").

*Mitchell v. Comm'r of Soc. Sec.*, 2019 WL 2399533, at *3 (W.D.N.Y. June 7, 2019); *see also Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("[c]ourts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary...").

   Here, the ALJ cited the same few items of evidence when analyzing all of the medical opinions. They are (1) one portion of Dr. Ippolito's report where she describes Plaintiff's thought processes as "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting" (Tr. 438); (2) one page of a multi-page report from Dr. Sheikh which predated Plaintiff's alleged disability onset date, which described her orientation and mentation as normal, and which was prepared as part of a visit to treat bronchitis (Tr. 470); (3) one page from a psychiatric assessment from Cattaraugus County Department of Community Services, done on August 6, 2013, which described Plaintiff as pleasant and cooperative and as being able to attend and maintain focus (Tr. 643); (4) one page from a follow-up visit which described Plaintiff's consciousness as normal and, again, as being able to attend and maintain focus; and (5) the same page of the August 6, 2013 evaluation which appears at a different place in the record (Tr. 1294-95).

   Considering the entirety of the record, the Court views these record citations as a classic case of "cherry-picking." Even the documents which the ALJ relied on state, in other portions of the same record, that Plaintiff had significant symptoms such as anxiety, psychomotor agitation, preoccupation with external stressors, flat or blunted affect, depressed and anxious mood, impaired memory, fear, nausea, difficulty breathing, terror, stress triggered by leaving home, dysthymia, impaired attention and concentration, and inability to manage funds. Other treatment records from the same sources, such as Dr. Sheikh, show that Plaintiff reported symptoms such as not wanting to be around people, described a severe panic disorder, was prescribed Klonopin for her for panic disorder, had paranoid ideation, was afraid to leave her home, had social phobia, and could not function in crowds. By essentially ignoring all of these findings and focusing on the occasional statements of normality in mental status exams - most of which bear no relationship to Plaintiff's chief complaints of anxiety, depression, and panic disorder - the ALJ presented a distorted picture of the record to support his conclusions.

   There is additional evidence which the ALJ seems to have mischaracterized or misinterpreted in order to reach a particular conclusion. For example, while the ALJ also minimized the significance of any medical opinions which were dated after the expiration of Plaintiff's insured status, Dr. Shamsi, who, in 2017, articulated limitations which are clearly disabling, was a treating source even before Plaintiff's insured status expired, and his description of the symptoms which Plaintiff endorsed and the treatment she received is not materially different from that which was reported during the insured period. Also, Dr. DeMarco, who reviewed the Cattaraugus County Department of Human Services report which the ALJ cited as supporting his determination of Plaintiff's residual functional capacity, said that Plaintiff

indicated the worsening of her symptoms began back in 2012 when she lost her job - which is consistent with Dr. Sheikh's notes - and also described the same symptoms that she reported to Dr. Sheikh, including agoraphobia and panic attacks. She also demonstrated some of the same behaviors in her interview with Dr. DeMarco, including moderate anxiety and psychomotor agitation. Dr. DeMarco indicated these symptoms were not responsive to four years' of treatment, which would date them back to October of 2012, well within the insured period. Given the record, it is simply insufficient to say that these conclusions are unreliable because they were based on Plaintiff's subjective report of symptoms - which is, after all, the primary basis for most psychological assessments, including the one done by Dr. Ippolito upon which the ALJ placed heavy reliance. Overall, the manner in which the ALJ cobbled together his reasoning process simply lacks substantial support in the record, and this is a sufficient basis for an order of remand.

### B.  Listing of Impairments

Plaintiff has also argued that the ALJ did not properly analyze the question of whether she qualified for disability under Sections 12.04 and 12.06 of the Listing of Impairments. Her argument on this point essentially tracks her contentions as to her first claim of error, being based on the ALJ's selective reading of the record. The Court does not view this claim as needing separate analysis. Since the ALJ should, on remand, reconsider the totality of the evidence, that will enable the ALJ to make a more thorough and supported review of whether the criteria set out in those sections of the Listing have been met. At the same time, the ALJ should also explain how the numerous mental limitations noted by Dr. Tzetzo factor into the residual functional capacity assessment.

### V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **GRANTS** Plaintiff's motion for judgment on the pleadings (Doc. 21), **DENIES** the Commissioner's motion (Doc. 24), and **REMANDS** the case to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

/s/ **Terence P.  Kemp**
**United States Magistrate Judge**